El Paso & Southwestern Railroad Company v. W. D. Foth.

Decided February 13, 1907.

**1.—Master and Servant—Assumed Risk—Statute Construed.**

The effect of the Act of 1905 (Gen. Laws, p. 386) was to eliminate the plea of assumed risk in any case where an employe has an opportunity before being injured to notify his employer, or superior given authority to remedy defects, of the existence of such defects, and does notify such employer or superior within a reasonable time. No such notice is required when the employer or superior knows of the defect. It also destroys the force of a plea of assumed risk where a person of ordinary care would remain in the service of his employer with knowledge of such defect and danger. The questions arising under said Act are questions of fact to be determined by a jury.

**2.—Same—Fact Case.**

Where a fireman was injured by the explosion of the "water glass" upon the locomotive, it was a question of fact for the jury to determine whether a person of ordinary care would have remained in the service of the defendant company when he knew that a defective water glass was being used, and the danger attending its use.

**3.—Assumed Risk—Contributory Negligence—Distinction.**

Entering or remaining in the employment of one who is known to furnish

defective appliances might be assuming the risks arising therefrom, but it would not be contributory negligence. The latter is the doing of some such act or omission amounting to the want of ordinary care, as, concurring with some negligent act of the master, is the proximate cause of the injury for which redress is sought. The first is an intelligent choice, the latter is carelessness.

### 4.—Safe Appliance—Question for Jury.

Whether or not a given appliance (in this case a water glass upon a locomotive) was a safe one, was a question to be determined by a jury and not by the railroad company. Evidence considered, and held to sustain a finding. that the defendant was guilty of negligence in failing to use an improved water glass.

### 5.—Assumed Risk—Passage of Law.

The Act of April, 1905, inured to the benefit of those already in employment as well as to those subsequently entering employment, and applied to defects in original construction as well as to those which arose from a failure to keep appliances up to the proper standard of safety.

### 6.—Defective Brief—Statement.

Where, in lieu of a statement under an assignment of error, reference is made to many pages of evidence copied in the brief under other assignments, and to certain pages of the transcript, it is not a compliance with the rules for the preparation of briefs.

### 7.—Reasonable Care—Evidence.

The mere fact that a railroad company purchases its appliances from the greatest manufacturer of the same in the world is not of itself conclusive evidence that it was not guilty of negligence.

### 8.—Assumed Risk—Act Constitutional.

The Act of 1905, concerning assumed risks is constitutional. The Legislature has the authority to compel the adoption by railroad companies of devices and appliances for the protection of those in their service; can declare that the doctrine of fellow servants shall not apply in cases arising between railways and their employes, and can alter, change or abolish the law of assumed risks. In determining the constitutionality of a law the same rules do not apply to laws for the regulation of corporations, creatures of the law, as apply to the government of natural persons not engaged in public service.

### 9.—Same—Police Power.

The regulation of railroads by the State is but the exercise of its police power over the creatures of its own creation, and there is no limit to this power except that it must be exercised for the comfort, safety or welfare of society; that it must not destroy any charter privileges, nor interfere with any vested rights.

### 10.—Same—Discrimination.

The Act of 1905, concerning assumed risks, is not unconstitutional because of unjust discrimination in favor of interurban electric railways. Legislation is not discriminatory that applies alike to all of the same class.

### 11.—Passage of Act—Invalidity—Proof.

The journals of the Legislature can not be looked to to invalidate a statute which was signed by the President of the Senate and Speaker of the House and approved by the Governor. These facts afford conclusive evidence that the Act was passed in the manner required by the Constitution.

### 12.—Same—Case Distinguished.

The case of Missouri, K. & T. Ry. Co. v. McGlamory, 92 Texas, 150, does not hold that irregularity in the passage of a law may be shown by the journals of the Legislature, but merely that they may be looked to in determining when a statute went into effect.

Appeal from the District Court of El Paso County. Tried below before the Hon. J. M. Goggin.

*Patterson, Buckler & Woodson,* for appellant.

*Jno. L. Dyer,* for appellee.

No briefs reached the Reporter.

FLY, ASSOCIATE JUSTICE.—Appellee instituted this suit for damages, alleging that on August 26, 1905, he was in the service of appellant, as a locomotive fireman, and that while he was on a locomotive, engaged in his duties as fireman, the water glass on the locomotive exploded and destroyed his left eye. It was alleged that the water glass was defective in being too thin to withstand the pressure of water and steam, that it was not properly adjusted, that it had not been inspected and tested and that the glass was not provided with a proper screen or guard so as to hold the glass in case of an explosion.

Appellant answered that it was impossible to protect the water glass so as to prevent explosions and possible injury, that appellee knew this when he entered appellant's service and that the glass was liable to burst and fly to pieces and so knowing he continued in appellant's employment and therefore had assumed the risk and was guilty of contributory negligence.

A trial by jury resulted in a verdict and judgment for appellee in the sum of $4,000.

The water glass mentioned in the petition is a tube made of glass ½ or ⅝ of an inch by 10 or 12 inches, and is placed on each locomotive to indicate how much water is in the boiler. The water glass stands straight up in front of the boiler head, in the cab of the engine, and is connected with the water in the boiler by a valve at the top and one at the bottom and through these valves water from the broiler enters the water glass. The water glass that exploded was protected by metal shields with slots or openings in them running the full length of the glass, about ½ an inch wide, there being four of the slots. It was shown that other railroads used a wire shield that went over the glass, the meshes being about ⅛ of an inch in size, making about sixty-four meshes to the square inch. The piece of glass that destroyed appellee's eye could not have passed through the meshes of the screen used by other railroads to protect the water glasses. Appellee while in discharge of his duty as a fireman had his left eye destroyed by the explosion of the water glass throwing a piece of glass into the eye. If the glass had been properly protected the injury to appellee would not have occurred. Appellee did not assume the risk arising from the use of the water glass, protected as it was, nor was he guilty of contributory negligence on account of remaining in the service of a company using such appliances.

The Twenty-ninth Legislature passed the following act: "Be it enacted by the Legislature of the State of Texas: Section 1. That in any suit against a person, corporation or receiver operating a railroad or street railway for damages for the death or personal injury of an employe or servant, caused by the wrong or negligence of such person, cor-

poration or receiver, that the plea of assumed risk of the deceased or injured employe where the ground of the plea is knowledge or means of knowledge of the defect and danger which caused the injury or death shall not be available in the following cases:

"First.  Where such employe had an opportunity before being injured or killed to inform the employer or a superior entrusted by the employer with the authority to remedy or cause to be remedied the defect, and does notify or cause to be notified the employer or superior thereof within a reasonable time, provided it shall not be necessary to give such information where the employer or such superior thereof already knows of the defect.

"Second.  Where a person of ordinary care would have continued in the service with the knowledge of the defect and danger, and in such case it shall not be necessary that the servant or employe give notice of the defect as provided in subdivision 1 hereof."  Gen. Laws, 1905, p. 386.  That act took effect on April 24, 1905, and was therefore in effect when appellee was injured on August 26, 1905.

The effect of that law is to eliminate the plea of assumed risk in any case, where an employe has an opportunity before being injured to notify his employer or a superior given authority to remedy defects, of the existence of such defects, and does notify such employer or superior within a reasonable time.  No notice is necessary when the employer or superior knows of the defect.  It also destroys the force of a plea of assumed risk where a person of ordinary care would remain in the service of his employer with knowledge of such defect and danger.  Of course, the matters as to whether an employe has an opportunity to notify his employer, and does or does not notify him, and as to a person of ordinary care, with knowledge of the defect, remaining in the service of the employer, are questions of fact to be determined by a jury, and the court very properly submitted those matters to the jury.

The testimony tended to show that the metal shield used by appellant around its water glass was defective in not being so constructed as to minimize the chances for pieces of glass to be driven out by an explosion with such force as to injure the employes, whose duties brought them in proximity to it.  It was a defect in construction that would clearly come within the purview of the statute of 1905.  The evidence established the defect, and justified the submission of the question as to whether a person of ordinary care would have remained in the service of appellant, when he knew that a defective water glass was being used and the danger attending its use.  The jury was justified by the evidence in finding that there was a defect and that appellee, although he knew of the defect, was justified in remaining in the service of appellant.

There is no antagonism between the proposition, as stated in the charge, that railroad companies are not insurers of the safety of their employes, and the propositions of law contained in the statute hereinbefore copied, and there was nothing in the statement of the different propositions calculated to mislead or confuse a jury.

How the question of whether a person of ordinary care would have remained in the employment of appellant after he knew the manner in which the water glass was equipped, was to be ascertained, is not clearly indicated by appellant, but it is insisted that a jury should not have

decided it. It had to be decided by someone, and being purely a question of fact we know of no other that had the authority, under the law of Texas, to decide it, except a jury. When they determined that issue in the affirmative, as the evidence undoubtedly justified them in doing, the question of assumed risk was removed from the case.

It is argued by appellant that appellee must have been guilty of contributory negligence if he knew of the defects in the water glass, but that does not necessarily follow. If he had not been relieved from the imputation of assuming the risk by the Legislature making the test the conduct of a person of ordinary care, a knowledge of the defects would create the state of assumed risk, but not of contributory negligence. The distinction between the two must be observed or confusion will result in the application of the rules pertaining to the two defenses. When it was proved that seventy-five or eighty persons were using engines on appellant's railroad equipped with water glasses, guarded as was the one that exploded and hurt appellee, it would seem that fact alone would show that persons of ordinary care would use such engines, and justified the jury in eliminating the question of assumed risk from the case. When that defense is removed from the case it does not necessarily follow, because appellee knew of the defects in the water glass that he was guilty of contributory negligence in remaining in the service of his employer. The rules of assumed risk and contributory negligence are dependent on widely separated tests and principles. Entering the employment of one who is known to furnish defective appliances might be assuming the risks arising therefrom, but it is not contributory negligence. The latter is the doing of some such act or omission amounting to a want of ordinary care, as concurring with some negligent act of the defendant, is the proximate cause of the injury for which redress is sought. There must be some positive act of commission or omission that caused the injury or contributed thereto. To illustrate, if the explosion had been caused by allowing the water to get too low in the boiler and it had been the duty of appellee to keep the water up to the safety mark, he might have been guilty of contributory negligence in failing to perform his duty. Or if he had been working with the water glass at the time and thereby caused the explosion, such might have been contributory negligence. He was doing nothing of the kind, but was engaged in the performance of the duty of sweeping the cab when the explosion took place. It is not pretended that the explosion took place on account of any act of commission or ommission on his part, but was caused by the inherent power of the hot water or steam. The glass not being properly guarded flew out and struck appellee.

Assumed risk refers to a general course of action in connection with the master's way of doing business and the appliance furnished; contributory negligence refers to the question as to whether the servant acted prudently in connection with a certain matter that arose for his consideration at a certain time and place. The first is an intelligent choice, the latter is carelessness. In the case of Mundle v. Hill Mfg. Co. (Me.), 30 Atl. Rep., 16, it was said: "Assuming the risks of an employment is one thing, and quite a different thing from incurring an injury through contributory negligence." Again in the case of Dempsey v. Sawyer (Me.), 49 Atl. Rep., 1035, it was held: "There is an

essential difference between the defense of contributory negligence and the defense of assumption of risk, a difference often obscured, but which should be kept clear in the mind for a correct understanding of the relative rights and duties of master and servant, as to the dangers arising from the use of defective machinery or appliances. Contributory negligence is a breach of the legal duty of due care imposed by law upon the servant, however unwilling or protesting he may be. Assumption of risk is not a duty, but is purely voluntary upon the part of the servant. The risk from the master's breach of duty never rests upon the protesting or unwilling servant. *Volens,* not *sciens,* is the test."

We conclude that mere knowledge of the defects in the water glass did not constitute contributory negligence. There was no want of ordinary care upon the part of appellee at the time of the explosion and hence he could not have been guilty of contributory negligence. It can not be held that acquiescence with knowledge is contributory negligence. (Hesse v. Columbus, S. & H. Ry. (Ohio), 50 N. E. Rep., 354.) As said by Labatt in his work on Master and Servant, p. 906, sec. 353: "The reasons for not inferring negligence, as a matter of law, under such circumstances, are, of course, stronger if it appears that the practice in question was pursued not only by the coservants of the injured person, but also by servants in other concerns of the same kind as that carried on by his employer." See also Florida Cent. & P. Ry. v. Mooney (Fla.), 24 So. Rep., 148; Illinois Cent. Ry. v. Clark (Ky.), 55 S. W. Rep., 699; St. Louis Cordage Co. v. Miller, 126 Fed. Rep., 503, and Johnson v. Southern Pac. Ry., 196 U. S., 1. None of the decisions cited by appellant is in conflict with the propositions hereinbefore expressed.

The rule herein stated is well sustained by the Supreme Court of Texas in the case of Texas N. O. Ry. v. Kelly, 98 Texas, 123, wherein it is said: "If knowing its condition, Kelly had used the defective handcar without any order of his superior officer to do so, but it appeared that under like circumstances a reasonably prudent man would have made the same use of the car, he could not be charged with contributory negligence, but the charge imposed upon Kelly the duty to show in addition that he was, at the time, acting under the order of a superior officer in order to exonerate him from the charge of contributory negligence." In this case appellant desired a verdict instructed for it, regardless of whether a reasonably prudent man would have worked on the engine under the circumstances or not. (Green v. Cross, 79 Texas, 132.)

If the contention made by appellant, that the question of whether an appliance is a reasonably safe one should always be left to railway companies, and should never be inquired into by courts or juries, should be sustained, railroad companies could never be held liable for injuries arising from defective appliances furnished to their servants. Whatever may be the attitude of the courts of the United States or other States, such a rule finds no countenance or support in the decisions of Texas. A railroad company can not be heard to justify its negligence in failing to exercise ordinary care in selecting the appliances to be furnished its employes, by a statement that it has the authority to choose its own appliances no matter how defective. The doctrine of the right of the master to carry on his business in his own way may be conceded, but it is not so sacred a right that a court or jury can not inquire into it to

ascertain if he has negligently injured his servant. The master may run his business in the way to suit himself, but subject to an inquiry as to whether ordinary care was used.

It was the duty of the railway company to use ordinary care to provide its engines with the best appliances and improvements for the protection of its employes and it was a question of fact as to whether such care was exercised. The final arbiter as to the exercise of such care cannot be the master, who of all others would be the most unfit tribunal to decide upon its own care, but must be an impartial jury in a court of law and justice. The evidence in this case shows the wisdom of such a rule, for it clearly appears that a use of the proper means, at the hands of appellant, in screening its water glasses, would have protected its employes from the dangers attendant upon the use of open slotted guards, that practically give no protection against constantly recurring explosions of the glasses. As said by the Supreme Court of the United States in the case of Choctaw, O. & G. Ry. v. McDade, 191 U. S., 64; "Where no necessity exists as in the present case, for the use of dangerous appliances, and where it is a matter requiring only due skill and care to make the appliances safe, there is no reason why an employe should be subjected to dangers wholly unnecessary to the proper operation of the business of the employer."

It was established, by a preponderance of the evidence, that a device for protecting against explosions was in use by other railroads that was much safer than the one used by appellant, and much of the evidence tended to show that such a device was an absolute protection. It appeared that appellant had adopted it on some of its engines, and that it could be substituted for the older device in a few minutes and at a small cost. The failure to adopt the safer and better device raised the issue as to the exercise of ordinary care in the selection of its appliances by appellant, and it was properly submitted to the jury. This proposition is upheld in Missouri, K. & T. Ry. v. Carter, 95 Texas, 461, where it was held: "The testimony in this case tended to prove that each of two different kinds of spark-arresters was used by railroad companies and each was considered by experienced railroad men as better than the other, which produced a condition in which it was necessary for the railroad company to make a choice between the two. Under this state of facts, it was the duty of the railroad company to exercise ordinary care,—that is, such care as a man of ordinary prudence would exercise under like circumstances to select and use the better of the two, but, having used such care as the law requires, it can not be held that a failure of judgment honestly exercised in an attempt to discharge the duty should render the company liable." It would seem apparent that a metalic screen with very small meshes would afford more protection from an explosion of glass than four upright pieces of metal, perhaps one-half an inch apart. It was the duty of the railway company to use ordinary care to provide its engines with the best approved devices for preventing injuries from the explosion of its water glasses.

We do not conceive that there is any merit in the contention that, as appellee was in the employment of appellant when the Act of 1905 went into effect and had assumed before that the risks arising from use of the water glass, which was in the same condition at that time as when

the injury was inflicted, the law did not apply to him. When the statute went into effect in April, 1905, the law as to assumed risks was changed according to the terms of that Act and had the same application to appellee that it did to those who might accept employment thereafter. (Coley v. North Carolina Ry. (N. C.), 57 L. R. A., 817.) We think there can be no doubt that the defect referred to in the statute is applicable as well to defects in the original construction as to those arising from a failure to keep the appliance up to the standard of safety. This conception of the law is amply sustained by cases cited in the notes to the case last above cited, among the number, Central of Geo. Ry. v. Lamb (Ala.), 26 So. Rep., 969; Ellis v. Pierce (Mass.), 51 N. E. Rep., 974, and Gunn v. New York, etc., Ry. (Mass.), 50 N. E. Rep., 1031.

The fifth assignment of error states that "the court erred in refusing to give to the jury defendant's special charge No. 3," and the sixth states that "the court erred in refusing to give defendant's special charge No. 4." For the statements under the two assignments reference is made to many pages of evidence copied in the brief under the first, second, third and fourth assignments of error and to certain pages of the transcript. Neither the charges nor their substance are copied in the brief. It is not incumbent upon this court to consider assignments of error under which such statements are made. (Haley v. Davidson, 48 Texas, 615.) It may be stated, however, that the law as applicable to the facts was given by the court and there was no necessity for other charges, even though they were correct expositions of the law.

The charge is not open to the criticisms contained in the seventh assignment of error. It did not invade the province of the jury and did not assume that it was negligent in appellant not to guard its water glass with a wire screen. There was evidence to the effect that the glass was not properly guarded and the court did not err in presenting that issue to the jury.

The eighth assignment of error is disposed of by what has been said hereinbefore in the discussion of the questions of assumed risks and contributory negligence. It was not error to submit to the jury the question as to whether a person of ordinary care would have remained in the employment of appellant with a knowledge of the defect in the water glass.

The contention of appellant that, because the guards on their water glasses, or some of them, were the kind "placed upon engines by the Baldwin Manufacturing Co., of Philadelphia," which is asserted to be "the greatest manufacturer of engines in the world," it could not be guilty of negligence in using such guards, can not be sustained. Two of the largest systems of railways in the world had displaced the "Baldwin slotted guard," because it was not deemed a safe device, for the purposes for which it was intended, and even appellant itself had begun the work of displacing it, and were using in its stead a wire screen which witnesses swore was much safer than the ones with the metallic bars. There was evidence to sustain the verdict of the jury.

The Act of 1905 is not "oppressive, arbitrary or unreasonable" nor is it unconstitutional. Similar acts have been in existence in England, Canada and different States of the union and have been uniformly sustained by the courts of last resort. Similar laws have been sustained

also by the Supreme Court of the United States. (McGuire v. Chicago, B. & I. Ry. (Iowa), 108 N. W. Rep., 902; New York & N. E. Ry. v. Bristol, 151 U. S., 567; Gulf, C. & S. F. Ry. v. Ellis, 165 U. S., 158; Buffalo East Side Ry. v. Buffalo St. Ry. Co., 111 N. Y., 131; People v. Boston & A. Ry., 70 N. Y., 569.) It is true as said by the Court of Appeals of New York in the last cited case: "Railroad corporations hold their property and exercise their functions for the public benefit, and are therefore subject to legislative control. The Legislature which has created them, may regulate the mode in which they shall transact their business, the price which they shall charge for the transportation of freight and passengers, the speed at which they may run their trains, and the way in which they may cross or run upon highways and turnpikes used for public travel. It may make all such regulations as are appropriate to protect the lives of persons carried upon railroads, or passing upon highways crossed by railroads." It could also be added that the Legislature has the authority to compel the adoption of devices and appliances for the protection of those in the service of railways, can declare that the doctrine of fellow servants shall not apply in cases arising between railways and their employes, and can perforce, alter, change or abolish the law of assumed risks.

In discussing the constitutionality of laws, the mistake is too often made of endeavoring to apply the same rules in the government of natural persons not engaged in public occupations, to the control of creatures of law, whose very existence rests in the hands of the legislative branch of the government and which can and must be regulated in a manner that individuals, in pursuit of private occupations, with a due regard to the principles of free government and the rights of personal liberty, can not be regulated. Barring an interference with vested rights, rights of property and the obligations of existing contracts, the Legislature may impose upon private corporations, engaged in serving the public, any additional restriction and burden that the public good may require or render proper and expedient.

The statute of 1905 interferes with no vested right and does not in any manner impair the obligation of contracts, but it is a measure passed, undoubtedly, to better protect the lives and limbs of those who are in the employment of railroads or street railways. It is an exercise of the police power of the State over the creatures that it has by its legislative fiat brought into existence. "This police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State." Cooley's Const. Lim., 7 ed., p. 831. The exercise of this police power is the exercise of a power belonging to State sovereignty, reserved and protected by the Constitution of the United States.

The clause of the Constitution which forbids the passage of laws impairing the obligation of contracts, is frequently invoked by private corporations to prevent the Legislatures of the States from regulating and controlling them, but it is uniformly held by Federal and State courts that they are subject to such regulations from time to time as may be deemed necessary to guard the rights of individuals and other corporations, shield the public health and protect the safety of life and limb. There is no limit to this police power, except that it must be exercised

for the comfort, safety or welfare of society; that it must not destroy any charter privilege, nor interfere with any vested right. The State of Texas has not transgressed these bounds in restricting the defense of assumed risk.

The Act of 1905 is not unconstitutional because of unjust discrimination in favor of interurban electric railways, which are not embraced within the terms of the statute. The argument in favor of that position, is answered by appellant when it asserts, and produces authorities to sustain its assertion, that an interurban railway is neither a "railroad" or a "street railway," as expressed in the statute. Being of a different class there can be no such thing as discrimination in their favor, for legislation is not discriminatory that applies alike to certain bodies or associations. So if interurban railways are embraced in the general term "railroads," or are "street railways," as used in the statute, the law applies to them, but if they belong to a different class or association, railroads and street railways have no more right to complain of their not being included in the law than that automobiles are not included. (Campbell v. Cook, 86 Texas, 630; Waters-Pierce Oil Co. v. State, 19 Texas Civ. App., 1.)

Appellant seeks to attack the validity of the Act of 1905, on the ground that the bill was not read on three several days in the senate nor did four-fifths of the senate vote to suspend the constitutional rule, and refers to the senate journal to substantiate its contention. It has been held in this State that the journals of the Legislature can not be looked to in order to invalidate a statute signed by the President of the Senate and Speaker of the House and approved by the Governor. (Williams v. Taylor, 83 Texas, 667; Ex parte Tipton, 28 Texas Crim. App., 438; Blessing v. Galveston, 42 Texas, 641; Day Co. v. State, 68 Texas, 526; Presidio County v. City Nat. Bank, 20 Texas Civ. App., 511; McLane v. Paschal, 8 Texas Civ. App., 398.)

In the decision in the Williams-Taylor case cited, which was rendered by the present Chief Justice of the Supreme Court, it is held: "Our Constitution provides, that after the passage of a bill it shall be signed by the presiding officer of each house in the presence of the house; and we are of the opinion that when a bill has been so signed and has been submitted to and approved by the Governor, it was intended that it should afford conclusive evidence that the act had been passed in the manner required by the Constitution. Such being the rule of the common law, we think, in the absence of something in the Constitution expressly showing a contrary intention, it is fair to presume that it was intended that the same rule should prevail in this State. There is no provision of the Constitution indicating in any direct manner such contrary intention; and the fact that it is provided that journals shall be kept and that certain things should be entered therein, we think insufficient to show any such purpose." It was further held that a rule permitting the use of the journals to invalidate a statute "would lead to inextricable confusion." The opinion of the Court of Appeals in Ex parte Tipton, cited above, is commended by the court, as well as the opinion in the State v. Swift, 10 Nevada, 176. In the Tipton case the following from the Nevada case is copied with approval: "Where an Act has been passed by the Legislature, signed by the proper officers of

each house, approved by the Governor, and filed in the office of the Secretary of State, it constitutes a record which is conclusive evidence of the passage of the act as enrolled. Neither the journals kept by the Legislature, nor the bill as originally introduced, nor the amendments attached to it, nor parol. evidence, can be received in order to show that an Act of the Legislature, properly enrolled, authenticated, and deposited with the Secretary of State, did not become a law."

Those decisions we think express the correct rule upon the subject and their soundness has never been questioned in any decision in this State. It is urged, however, that in the case of Missouri, K. & T. Ry. v. McGlamory, 92 Texas, 150, it appears that the Supreme Court did look to the journals of the Legislature in determining when a statute went into effect, and therefore by implication overruled its decisions as well as those of other Texas courts on the subject. But there is no force or merit in that position for in the McGlamory case the journals were consulted only to ascertain if two-thirds of both houses had voted to give effect to a statute from date of approval, and that action is in entire accord with expressions in the Williams-Taylor case wherein it is said, in distinguishing it from Ewing v. Duncan, 81 Texas, 235: "The signatures of the presiding officers and the approval of the Governor attested the passage of the act, but did not determine that it had taken effect from date of its passage. There being no method of attesting the fact, that a bill which purports to take effect from its passage has received the required two-thirds majority, we deemed the journals the best evidence upon the question, and looked to them for that purpose only." It is not contended in this case that the vote was not sufficient for immediate passage of the act of 1905. The judgment is affirmed.

*Affirmed.*

Writ of error granted, 101 Texas, —.