## FREEMAN v. GERRETTS.

(Court of Civil Appeals of Texas. Austin. June 12, 1912. Rehearing Denied Oct. 23, 1912.)

1. MASTER AND SERVANT (§ 204*)—PERSONAL INJURIES—RAILROADS—CONTRIBUTORY NEGLIGENCE.

Under Sayles' Ann. Civ. St. Supp. 1910, p. 400, §§ 1, 2, providing that in personal injury actions against railroads the negligence of the employé injured shall be no defense, it is immaterial whether the employé is guilty of contributory negligence as a matter of law or in fact.

[Ed. Note.—For other cases. see Master and Servant, Cent. Dig. §§ 544–546; Dec. Dig. § 204.*]

2. MASTER AND SERVANT (§ 281*)—PERSONAL INJURIES — RAILROADS — CUSTOMS — EVIDENCE.

In an action against a railroad for personal injuries, evidence *held* to show that riding on the brake beams of switch engines was a custom approved by the defendant.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 987–996; Dec. Dig. § 281.*]

3. MASTER AND SERVANT (§ 124*)—PERSONAL INJURIES—RAILROADS — INSPECTION — CUSTOMS.

Where a railroad had acquiesced and approved the custom of switchmen in riding on the brake beam of the engine, it owes the duty to inspect the same, and not allow them to become so loose as to swing to the side when stepped on.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 235–242; Dec. Dig. § 124.*]

4. MASTER AND SERVANT (§ 278*)—PERSONAL INJURIES—RAILROADS — NEGLIGENCE — EVIDENCE.

In an action for personal injuries by a switchman injured by the brake beam swinging to one side when he stepped on it, and causing his foot to slip under the wheel, evidence *held* to warrant a finding that the brake beam was defective, and that defendant had not discharged its duty of inspection.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. § 278.*]

5. MASTER AND SERVANT (§ 281*)—PERSONAL INJURIES—CONTRIBUTORY NEGLIGENCE—EVIDENCE.

In an action for personal injuries by a switchman, injured by his foot slipping under the wheels of the engine on account of the defective brake beam on such engine, evidence *held* to warrant a finding that such switchman was not guilty of contributory negligence in riding on such brake beam.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 987–996; Dec. Dig. § 281.*].

6. DAMAGES (§ 132*)—EXCESSIVE DAMAGES—PERSONAL INJURIES.

In a personal injury action, where plaintiff, a switchman 30 years of age, had to have his foot amputated, and a sensitive spot was left, which aches like the exposed nerve of a tooth, and his earning power was reduced from $1,000 to $60 a year, a verdict of $15,000 will not be held excessive.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 372–385, 396; Dec. Dig. § 132.*]

Appeal from District Court, Falls County; Richard I. Munroe, Judge.

Action by J. N. Gerretts against T. J. Freeman, Receiver of the International & Great Northern Railroad. Judgment for plaintiff, and defendant appeals. Affirmed.

Wilson & Dabney, of Houston, and Baker & Baker, of Waco, for appellant. Tom Connally, of Marlin, and A. G. Greenwood and Thos. B. Greenwood, both of Palestine, for appellee.

KEY, C. J. This is a personal injury suit, which resulted in a verdict and judgment for the plaintiff for $15,000, and the defendant has appealed. The plaintiff's petition charged that the defendant was guilty of negligence in failing to exercise proper care to furnish and maintain a brake beam in reasonably safe condition for appellee's use as a brakeman upon one of the defendant's cars.

The defendant pleaded a general denial, assumed risk, and contributory negligence.

[1] Appellant has assigned no error upon the charges given, and only two as to the refusal of requested instructions. One of the requested instructions referred to was a peremptory charge to find for the defendant, and the other made contributory negligence an absolute defense and a bar to any recovery, which is not now the law in this class of cases. In 1909 the Legislature enacted this law: "That in all actions hereafter brought against any such common carrier or railroad, under or by virtue of any of the provisions of this act, to recover damages for personal injuries to an employé, or where such injuries have resulted in his death, the fact that the employé may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé," etc. Supp. Sayles' Civ. Stat. 1910, p. 400. This law was in force when the plaintiff in this case was injured, and was embodied in the court's charge; but appellant contends that it should not apply, for the reason that the plaintiff was guilty of contributory negligence as matter of law. While we do not hold that appellee was guilty of such negligence, still, if he was, we see no reason why that fact would take the case out of the purview of the statute quoted. The defendant was a common carrier, and the plaintiff was his employé, which brings the case within the class covered by the statute, and the statute declares, in plain and unmistakable language, "that in all actions," which fall within that class, the fact that the employé may have been guilty of contributory negligence shall not bar a recovery. Under the plain and obvious purport of the statute, it is immaterial whether the employé is guilty of negligence as matter of law or fact. In truth, the distinction referred to is of little importance except as to questions of procedure. Hence we hold that no error was committed in refusing to give the requested instruction referred to.

All the other assignments are based upon the alleged insufficiency of the testimony to show liability, or upon the contention that if liability was shown, the amount of damages awarded was excessive.

The proof shows that on the 8th day of April, 1910, the defendant, as receiver, was operating what is known as the International & Great Northern Railroad; that the plaintiff was employed by him as a brakeman on a train running between Mart and Bryan, Tex. Among other things, the plaintiff testified as follows:

"On the morning of the 8th day of April, 1910, I was working on a local freight train; I was head brakeman. The train started out on the 8th day of April, 1910, from Mart, Tex., at about 8:15. Its destination was Bryan. It ran in a southerly direction from Mart, Tex., to Bryan, Tex. The train was made up at Mart. The car started out from Mart that morning, the car upon which I was hurt. Mart is a terminal on the line of the International & Great Northern Railroad Company. I was hurt at about 9:30. I left Mart, Tex., at about 8:15. I was injured near McClanahan, which is 12 miles from Mart, south thereof. My train did work that morning at McClanahan station. * * * There were orders given with reference to the work I was doing. * * * The conductor gave these orders to pick up four cars at the spur. We moved south at that time, about two trains' length. Then we flagged down and went back and cut off four cars and signaled the fireman to go ahead. We cut these cars off behind the engine; that is, the four cars. I did the uncoupling myself; then I flagged the fireman ahead, and I grabbed the ladder on the left side and rode to the switch, and then I got off and walked across the track and flagged the engine down and opened the switch; I mean the spur switch, which was the switch to that track. That was the track upon which these four cars were sidetracked. I threw it so that we could back those cars into the spur track to pick up those other four cars. The train had to move north when you backed those four cars against the four cars on the spur track. It had to back north. After I threw the switch, the next thing I did was to flag the engine and give them a slow back-up signal. It was responded to by the engineer backing up very slowly. In carrying out the directions of the conductor and the switchman, I noticed both couplings—on the cars that were in the train and on the car that was on the spur. Both knuckles being closed, it became my duty to open one of them so they would be able to couple.

"I know the purpose of a handhold at the end of the cars. It is for grabbing the grab-iron if walking or running between the cars, while cutting cars on the train, and for riding brake beams. I know the custom of brakemen with reference to riding brake beams and supporting themselves with the handholds at the end of the car, and with their feet on the brake beams, while coupling and uncoupling cars. I have seen that every place I have worked. I have served as brakeman four or five years. I know that custom. It is this: Brakemen are all required to do switching and to be quick. They use these brake beams to jump on, and this grabiron, every time there is any switching to do, nine times out of ten the brakeman uses the brake beam. The brake beam was made out of angle iron, and was about four or five inches wide, both ends turned up and hollow in the middle. It extends from one wheel to the other. The length of the brake beam across the end of the car from wheel to wheel is about four feet and a half. There is a bolt about eight inches

long connected with a brake beam on a car to prevent it from pushing sideways when it is mounted. This bolt is called the guard bolt. * * * Each of these guard pins or bolts is about three-quarters of an inch from the wheel nearest to it. With these guard pins in proper position, and with the brake beams perfectly adjusted, there is about three-quarters of an inch movement of the brake beam sideways. * * * At each end of the brake beam there is a shoe and a brake head, and the brake head is fastened to the angle iron or brake beam, and the brake shoe fits against the ball of the wheel on the other side. The purpose of the brake shoe in connection with the brake beam in the operation of the train is to stop the train when the brakes are applied. It brings the shoe against the wheel, and that stops the train, and when released the brake shoe moves back. When the brake beam and its parts are properly adjusted, the brake shoe stands off from the wheel about a quarter of an inch. The movement of the brake beam backwards and forwards is regulated by the lever. When it is perfectly adjusted, the play of the brake beam backwards and forwards is about three-quarters of an inch—about a quarter of an inch play backwards and forwards; that is, the sideways play between the guard pin and the wheel is about three-quarters of an inch. If there had been no greater play of the brake beam than three-quarters of an inch on the morning of my injury, my foot would have landed right on the face of the shoe; that is, on top of the brake beam. It would have landed right square on the brake beam.

"I know what an inspection would have disclosed so far as the absence or improper adjustment of the rods that connect it with the brake beam. This would have been disclosed by the car inspector looking over the train and examining the truck, while it was being inspected at Mart. I don't know how long before it had been inspected. We left Mart at 8:15 in the morning, and it was inspected before we left. I was injured about 9:30 in the morning. There was nothing in the movement of the train that morning which would have the effect to have displaced or removed the guard pin or the adjustment of those rods, if they had been in ordinary safe condition. There was nothing in the movement of the train that morning to dislocate the brake beam and the guard pin, or change the adjustment of the rods. I saw two inspectors around the train that morning, one on each side.

"As the cars backed on me, backing very slowly, I grabbed the grabiron and put my left foot on the brake beam, and the brake beam sheered over to the side and caused my right foot to hit the top end of the brake beam, right about this part of my foot, causing the foot to hit the ball of the track, and the wheel passed over it, catching my toe and passing right across here, mashing this part of my foot. The first part of the end of the car which I caught was the grabiron. I caught it with both of my hands, and at the time I did so the train was moving backwards towards me. It was moving very slowly. It was backing up north towards the cars in the spur track. After I caught the handhold, my left foot first struck the brake beam. At the very time my foot struck the brake beam it sheered over and went about eight inches, six or eight inches, over inside the wheel. With reference to the flange of the wheel, it, the brake beam, moved inside of the wheels about eight inches. The brake beam moved sideways. It moved sideways from the direction I jumped on it. I jumped this way, and the brake beam went that way. I attempted to put my other foot on the brake beam, and it struck the very edge of the beam—the end of the beam. My foot did not land squarely on the beam. It hit the rail. When the car approached me I moved this way, my left foot hit the beam and my hand hit the hold at the same time. The car was moving very slowly. I gave a slow signal. I didn't have to swing in. The grabiron is about four or five inches from the end of the car. I caught this grabiron with both hands. I lifted this foot at the same time I did my hand; I mean my left foot. I put my left foot on the brake beam. The brake beam is right down under the wheels near the ball of the rails, and it extends from wheel to wheel. * * * Both feet did not hit the brake beam straight, nor at the same time. The left foot hit first. I was standing on my right foot, and this foot was raised, and my hands were out this way and my foot was raised to catch the brake beam. My hand caught the grabiron. As my left foot hit the brake beam it sheered over to the side to the opposite direction. The brake beam sheered over, because the brake beam came inside the wheel.

"I never examined that brake beam before I stepped on it. I never had any one to examine it for me since, because I was in such pain at that time I was looking for a surgeon, and not for some one to examine the box car."

On cross-examination by appellant's counsel, appellee testified: "My right foot missed the brake, slipped off the end of the brake beam. It failed to hit the brake beam right on the end; it failed to hit the whole part. I do not know what caused my foot to slip."

While other members of the train crew saw the plaintiff at the time he was injured, and went immediately to his assistance, they did not profess to know or state how or why the injury occurred. They all testified that the train was backing in slowly, none estimating its speed in excess of four miles an hour, and some saying that it was just moving. The defendant introduced much testimony tending to show that the brake

beam was an apparatus designed and used for the purpose of checking the speed or stopping the cars, and not as a place or means to be used by a brakeman in the performance of any duty. It was also shown that the plaintiff could have performed the duty he was then performing without getting on the brake beam; he could have run ahead of the moving train and adjusted the knuckle before it reached the other car, or he could have given a signal and stopped the moving train while he adjusted the knuckle. Besides the testimony upon that subject given by the plaintiff there was much other testimony tending to show that it was a custom or practice for brakemen to ride on the brake beam, as the plaintiff in this case attempted to do.

Conductor T. H. Riley testified: "The brakemen who grab the grabirons and ride on the brake beams do it at their own risk. It is a practice on the International & Great Northern, and was in April, 1910, both going and coming. In making a coupling, you must either be there by the side of the car that is still, or else at the end of the car that is moving towards the other car."

Conductor Horn testified: "They do ride the brake beams. I do not know that they practice it, but it is done and on the International & Great Northern." Yardmaster Eyan testified: "If he [the brakeman] was on the engineer's side it would be proper for him to ride on the ladder. * * * Sometimes they stay on that until the train gets to where a coupling is to be made, and sometimes they get off before and run along by the side of the car. * * * In running along by the side of the car, if either one of the knuckles needs to be open, if he is on the right-hand side, he would have to go in between them. He would have to go in between the car that was moving and the car that was standing still to fix the knuckle. In doing that he would either grab the grabiron and put his foot on the brake beam, or else he would walk along between the moving car and the other car, if they didn't stop the engine. He would either put his feet on the brake beam and ride, holding to the handhold in between the moving cars. It is dangerous for them to run along between the cars that way."

Brakeman J. L. Holland, in the same crew with appellee, testified: "I have seen a coupling made when both knuckles are closed. When a car is coming back two or three miles an hour, if a coupling is made, it would have to be open. It would be the duty of the brakeman to see that the coupling was properly made, and if the knuckle isn't open, to open it, and do what is necessary to open it. I have seen lots of brakemen ride brake beams with their hands on the handholds, and their feet on the brake beam, and I have done it myself. * * * I have seen it done very often. It isn't every man who does it;

there is not one in 25 that will do it—sometimes a man does it. They do not always get fired when they do it. I never heard of anybody getting fired for it. * * * I have seen them doing that with the car going both ways. I never heard of anybody being fired for it. Sometimes I do it. * * * I couldn't name the number of times I have seen experienced brakemen do that. * * * I was never reprimanded for this course by the railroad company's officials."

Night Yardmaster Wicks testified: "If four cars were coming on a spur with an engine attached to pick up some empties, if in order to make a coupling it was necessary to adjust a knuckle, it would be proper for a brakeman to run between the cars and adjust the knuckle and flag them down or stop. It they were moving back at a reasonable rate of speed, he could walk on past it and open the knuckle and step out, and if they were not, he would stop them. I do that all the time. * * * I walk along with the car, if necessary, and adjust the knuckle. * * * If I should stumble, the car would run over me. That is done every day right in the yards in Palestine. If they are going at a reasonable rate of speed, you do not always go out and flag them down and make them stop, and go back and fix the knuckles and flag them up again, and make a coupling or adjust a knuckle. * * * If they are going three or four miles an hour, that is the proper way. Let him get down on the ground and walk in and open the knuckle. There is very little danger in that. There is not one chance in a thousand for a man to get hurt at that. I expect that is done in the Palestine yards 500 times a day. I never heard of a man getting hurt at it for the last five years. I don't reprimand them for doing that. This is the only brakeman I know of who has been injured by riding on the brake beam and holding to the handhold. We ride out all the time that way. There is very little danger in riding the brake beam away from you. There is no danger riding them towards you, if you have your hand on the handhold and your feet on the brake beam, if you keep them there and don't fall off. If you miss your footing you are gone."

Trainmaster Conner testified: "A person could catch the iron and ride along on there, or he could hold the iron and trot along on the ground. * * * Sometimes your feet would be on the ground. * * * I could put them on the brake beam if I wanted to. That is not the place to put them. The reason I said sometimes is because if I felt like it I would put them there. In order to put them on the ground you would have to trot along with that car. No; it is no more dangerous to trot along than it would be to put your feet on the brake beam. I have done it a million times. It is all dangerous twisting

around cars. I don't know whether it is more dangerous than to have the grabiron in your hands and have your feet on the brake beams. Sometimes it is, and sometimes it isn't. I don't believe a brakeman could hang on the ladder on either side of the car and reach around and open the knuckle there on either one of the drawheads. His arm wouldn't be long enough. They can hang on and reach down and pull the lever. * * * I don't see any on the right-hand side. There is no lever there. He couldn't have hung on the ladder on the right-hand side (where he had to be to signal the engineer), because there was not any lever there, no lever and no ladder there, and he couldn't have pulled it. * * * If both knuckles are closed, a coupling cannot be made automatically by impact. One or the other of those knuckles has to be opened."

Conductor Horne swore that: "If both knuckles are closed it would be necessary for the brakeman or switchman to open one of those knuckles. It is a fact that the cars only had these lift levers on the rear side and on the right forward side, just like the steps and the ladders."

The only two witnesses who testified to the custom of brakemen in using the brake beam in coupling cars, aside from appellee and appellant's employés, were Jake Hesser; a merchant owning a furniture store at Marlin, and E. M. Ware, chairman of the carmen's board for the International & Great Northern System.

Jake Hesser testified: "My furniture business is located on the corner of the square next to the International & Great Northern railway track on the west side thereof, and about 30 feet therefrom. * * * I watched brakemen all the time I did business there on the square. It was the custom of brakemen switching cars to ride on the brake beams of the cars and to hold the handholds at the end of the cars, and they did this while the cars were coming towards them. It was their custom to do this. It has not been but a few days since I noticed that; a fellow was riding a train that was coming back. * * * I never heard of a brakeman being reprimanded for doing it."

E. M. Ware testified: "I know the custom among brakemen or switchmen on the International & Great Northern Railroad with reference to the riding of brake beams on moving cars while backing, with their hands on the handholds and their feet on the brake beams. I know the custom. They usually ride on the brake beams when there are outside brakes, when it is necessary to adjust knuckles or to fix air hose, and in making couplings. There is no difference between the custom as practiced on the road and that practiced by the switchmen in the yards. It is practically the same. They are used on the road for the same purposes that the switchmen use them. They generally use

the brake beam when it is necessary to adjust a knuckle or to attend to some of the appliances about the coupling. * * * It has been often practiced at Palestine. * * * I am upon the yards at Palestine as often as three times a week. I never knew a brakeman or switchman to be reprimanded or discharged, either one, because he rode a brake beam when the car was in backward motion, not during all of my service of seven years. There would be more danger of running ahead of the moving train, and undertaking with your hands to adjust everything in front of the moving train than in riding the brake beam with your feet on the brake beam and your hands on the grabiron, because in riding the brake beam he has the handhold to hold to for safety, and if he is on the ground, and he happens to trip up, he has no protection, because he has nothing to hold to. If they have the outside brakes, they use the brake beam and stand on it and hold the handhold, and if they don't have the outside brake beam, there is nothing to do but to adjust the knuckle from the ground."

By the court's charge the plaintiff's right to recover was made to depend upon a finding by the jury that the defendant was guilty of negligence in failing to exercise ordinary care to maintain the brake beam in a reasonably safe condition, and appellant contends that the proof fails entirely to show negligence in that regard. The plaintiff testified that when he put his left foot upon the brake beam and attempted to mount it, it sheered or moved six or eight inches towards the opposite side, thereby removing the brake shoe from over the wheel and preventing his right foot from making a landing upon the brake beam, and causing it to be run over by the car wheel. The defendant put in evidence a written statement, made by the plaintiff about a week after the accident, in which he stated, in substance, that his foot slipped and went under the wheel, and that he did not know what caused it to slip, and that he knew of no carelessness on the part of any of the defendant's employés tending to cause the accident. The statement referred to was procured by an agent of the defendant, employed to investigate and ascertain the true facts concerning all accidents resulting in injuries to employés or others. The plaintiff testified that at the time he signed the statement he was under the influence of opiates, was nervous and full of pain, and told the agent that he could not make a statement; that the agent insisted on his making a statement—wrote that one out, and he signed it. Immediately after being injured, the plaintiff was put on a train and carried to Marlin, where his foot was amputated; and two doctors who performed the operation both testified that before administering the anæsthetic he stated that he caught the grabiron on the end of the car, and his foot slip-

ped. off of the brake beam, and was caught under the wheel and mashed. There was other testimony tending to show that the plaintiff had made similar statements to other witnesses, in none of which he stated that the brake beam moved to the right, and thereby caused him to lose his footing. The defendant also introduced testimony tending to show that the car in question had been inspected about two hours before the accident; that there was some inspection immediately after the accident and some the next day, when photographs were taken, tending to show that the brake beam was apparently in good condition. It was also proved that if the brake beam and all of its rigging were in good condition, placing the weight of a man upon it would cause the brake shoe to clamp the wheel, and that when so clamped it would be impossible for the brake beam to move six or eight inches, or any other appreciable distance, in the opposite direction. In other words, when the brake shoe clamps the wheel, the flange on the inside of the wheel necessarily prevents lateral movement in the direction of the other wheel.

In view of the testimony referred to, appellant contends that the physical facts show that the brake beam did not move six or eight inches in the opposite direction when the plaintiff attempted to mount it, as testified to by him. On the other hand, it is contended on behalf of appellee that the jury had the right to accept the plaintiff's testimony in that regard as showing that the brake beam did so move, and therefore that it could not have been in proper condition; and it is further contended that the inspections referred to were not shown to be such as should have been made, and that the testimony coming from the defendant's witnesses tends to show that there was too much slack in the gearing of the brake beam, which fact tends to support the plaintiff's statement that the brake beam moved in the opposite direction, and thereby caused the accident. On that branch of the case we copy the following statement from appellee's brief, which seems to be substantially correct:

"Engineer Lord on this point, testified: 'If you grab the grabiron on the end of the car and swing yourself on the brake beam—step on in the manner that brakemen and switchmen would likely do—and if the brake shoe is in first-class order, it will push against the wheel. I should judge that the flange of the wheel prevents it from slipping.' The engineer is corroborated by appellant's expert switchman Wilkey, who swore: 'A while ago, in answer to Mr. Baker, I stated that in getting on a brake beam if the rods under the brake beam under the truck were perfectly adjusted, the brake shoe would clamp the wheel. That is correct. And if there wasn't any side motion, the brake shoe would strike the flange, even if there were no guard pins there. That depends, however, upon the proper adjustment of the rod underneath the brake beam.' To the same effect was the testimony of the Palestine yardmaster, who was asked: 'Do you know the effect of the brake shoe upon the tread of the wheel by a brakeman or switchman grabbing hold of the grabiron on the end and putting his left foot on the brake beam, with the intention of riding the train? Do you know the effect of that, or what it does with the brake shoe upon the tread?' and who answered: 'It would clamp it to the tread. It would naturally shove it up to the tread of the wheel. That is the only effect I know of. If you throw yourself on that brake beam there and grabiron, with the intention or calculation of making the slide, or attempting to slide it, getting on it slantingly, if it is in good condition, it would still clamp the tread. I have tried that here.'

"Let us next set out the testimony of appellant's own witnesses as to whether the brake beam was in first-class order or in good condition, or 'in proper adjustment by the rod beneath the brake beam.' The jury had the right to accept as true the statement of appellant's very first brake beam expert, Mr. Conner, based on 38 years' experience as switchman and brakeman, conductor and trainmaster, when he gave a test of 'proper condition' as follows: 'If those pins and everything else were all in proper condition, there would only be a play of a quarter of an inch sideways, and a quarter of an inch backwards and forwards. I mean by this that the usual play was only a quarter of an inch either to the right or left, and only a quarter of an inch backwards and forwards.'

"The first person to examine the brake beam after appellee's injury, according to appellant's evidence, was Conductor Johnson, who testified: 'It is my duty to report accidents and give all the information I can when there is an injury. * * * I made a personal examination of this particular car. * * * This particular car I have examined had about two inches play; I wouldn't say for sure it is two inches—I didn't measure it. It could have been a little bit more than two inches, but there is a standard in there.' Question: 'But it might have been a little more?' Answer: 'It was standard. I don't know what the standard is. The way I looked at it, it was something like two inches; it looked to be, I guess it was about like that when you push it over against the flange. I think there was something like two inches, just about two inches.' Question: 'It might have been a little more than that, might it not?' Answer: 'I am not sure. I don't think it was any less than that.' Question: 'But it might have been more?' Answer: 'It was standard.' Question: 'I am talking about the way it looked to you; you were standing there looking at it?' Answer: 'Yes, sir; I

don't think it could have been under two inches. I don't think it could have been but very little more than two inches.' Hence, according to the testimony of this conductor, he saw the brake beam move just after appellee lost his leg, at least eight times as far as 'proper condition' required; that is, eight times a quarter of an inch, and maybe 'a little bit' farther.

"Mr. Conner swore that the movement of the brake beam on which appellee was injured, not only ought to have been, but was, a quarter of an inch backwards and forwards and a quarter of an inch sideways. But appellee's car foreman, Mr. Breed, who inspected the brake beam with Mr. Conner, swore: 'I said it had three inches lateral play between the guard pins and the guard of the wheel. Three inches play would let it pass over the center of the flange. Three inches lateral motion would let it pass just over the center line of the flange.' In another part of his testimony Mr. Breed said, in answer to the question as to 'What was the lateral motion this particular brake beam had?' that such motion was 'not less than one and a fourth and not more than one and three-fourths' inches, adding that this was standard and proper, notwithstanding the two things to cause it were 'from the brake shoe being worn on the side next to the flange, and another thing from the flange of the wheel being slightly worn.' So the fact remains that, according to Mr. Breed's testimony the brake beam had 12 times the play (12x¼ inch equals 3 inches) or 7 times the play (7x¼ inch equals 1¾ inches) which Mr. Conner swore was the play of a properly adjusted brake beam.

"Appellant's assistant claim agent Ramsey testified that he tried 'to anticipate the probable question that might arise in the case,' and so examined the brake beam. But he says he examined it 'only casually'; that he was 'attempting to see that it wouldn't go over the flange, and it didn't go over the flange'; that he took his foot and attempted to push the brake beam over as far as it would go, and 'got back and took a picture,' and then he 'got on the other side and put his foot against it and pushed, and took a picture of it in that way.' 'In pushing this brake beam I got on the end of the brake beam and shoved it over, and then went off and took my picture.' There was nobody there to hold his foot on the brake beam. Pictures so taken could not show the full extent of the movement of the brake beam, as appears from the testimony of appellant's witness Breed, who said: 'When any one put his foot on there and shoved it to one side, gravity would bring it almost back to the center. * * * If you should shove it very much out of line, it would come back very nearly to the center.'"

As to inspections, the defendant's car inspector at Mart testified that he was such inspector on April 8, 1910; that he kept a book of inspections, which he had with him, and which book showed that he inspected car No. 10,190, which was the car in question, and found on one side there was a door cap gone, and that that was the only defect shown by the entries in the book; that inspection was made at 7:25 a. m., and about two hours before the accident referred to. He stated that it was his duty, as inspector, to inspect thoroughly, and ascertain all defects; that he examined and found the guard pins were in position, and that the brake beam was in perfect condition. On cross-examination he stated that the only entry in his book was a description of the car, the date and the words, "One side door cap gone"; that there was no entry in the book about the condition of the brake beam nor guard pins; that he inspected all of the cars that came into the yards at Mart, which he estimated as at least 50 each day, and that at the time of testifying he had no distinct recollection of inspecting the car in question, and was merely going by what was shown and indicated by his inspection book. The trial occurred over a year after the accident, and the witness frankly stated that he was relying upon the entries in the book, and had no recollection, independent of the book, concerning the inspection referred to. As to inspections made after the accident, we quote the following fairly correct statements from appellee's brief:

"The engineer Lord swore: 'I saw his body in trouble immediately upon his grabbing the grabiron. I then put on the air in emergency and reversed the engine, and got down and ran to his assistance. * * * I looked at the brake beam to see if it was all right, and also at the grabiron, and I didn't find anything at all defective there. I didn't get on it. * * * The brake beam and its appurtenances seemed in first-class order. * * * I only looked at the brake beam, and it was apparently all right. * * * I didn't put my foot on it to see how much play it had backwards and forwards. * * * I won't be sure that it was just like I left it when the air was clamped on it. * * * I can't say whether the brake beam was set or not. If the brake beam was set, nothing could have moved it without releasing the air. No, sir; he couldn't have moved it at all with the brake set. I cannot now recall whether the brake was set. * * * I don't swear that those brakes were not set. I was looking at them, and if they had been set hard and fast, I couldn't have told whether they had any play backwards and forwards. When you put on the air that would pull the brake shoes in, if it [the brake beam] should swing to the left eight inches, on account of the play in the brake shoe, that play would be sufficient for it to swing back before the air was applied.' In this connection Ware, a disinterested witness, swore:

'The backward and forward movements of the brake are controlled either by the hand brake or by the piston travel of the air cylinder. When those rods and levers which control the movement of the brake beam backward and forward are perfectly adjusted, it is not necessary to have more than half an inch clearance. The limit of safety stops in the clearance of the beam when moving backward and forward, even if the pin [i. e., the guard pin] is in there, after two inches. More than two inches of slack in the brake beam would make it dangerous with the pin there. * * * If the car was at a junction on a side track, all the slack would be taken out of a brake by using the hand brake, provided the rods were all connected, although there was as much slack as four or five inches in the brake beam's backward and forward movement.' "

There was no testimony showing affirmatively that in any of the inspections that were made, either before or after the accident, there was any examination of the rod and pin adjusting the movement of the brake beam. In fact, it was not shown that the inspector who made the inspection at Mart before the accident occurred tested brake beams to ascertain if they were in proper condition for use by brakemen as a place to ride on. He testified that it was his custom to make thorough inspections, but as to brake beams he may have meant, by the use of the language referred to, that he examined them for the purpose only of ascertaining if they were in proper condition to perform their primary and main functions, which were to check the movement of cars. No doubt the defendant was contending in the court below, as in this court, that a brake beam was designed for an entirely different purpose, and that the law imposed no duty to keep it in safe condition for the use of brakemen; and, such being the defendant's attitude, we think if he desired to show an inspection with a view to proving its condition as to safety for the use which the plaintiff attempted to make of it, he should have at least shown that it was customary for the inspector to test or examine brake beams with a view to their safety for such use.

While there was some other testimony tending to support the main contentions of the respective parties, the salient features of the case are shown by the foregoing statement; and, after a careful consideration, we have reached the following conclusions as to the questions presented for decision:

[2-4] 1. There was evidence tending to show, and the charge of the court required the jury to find as a prerequisite to the plaintiff's recovery, that the use which he attempted to make of the brake beam was acquiesced in and approved by the defendant; and, if such was the fact, then the defendant owed the plaintiff the duty to exercise ordinary care for the purpose of keeping the brake beam in a reasonably safe condition. It may be conceded that the brake beam was not originally intended for such use by brakemen, and that such use had been prohibited; nevertheless, if, as the plaintiff testified, brake beams were used for that purpose nine times out of ten, or if they were generally so used, as the testimony of other witnesses tended to show, and the defendant, knowing of such use, had acquiesced and approved it, we hold that the law imposed upon him the duty heretofore stated. Ry. Co. v. Harris, 45 Tex. Civ. App. 542, 101 S. W. 506; Railway v. Conway, 44 Tex. Civ. App. 68, 98 S. W. 1073; Railway v. Templeton, 87 Tex. 42, 26 S. W. 1066; Railway v. Keith, 124 S. W. 695. We also hold that there was testimony to support the finding of the jury that the defendant had not performed that duty, and was therefore guilty of negligence in that regard. The direct and positive testimony of the plaintiff, to the effect that the brake beam moved six or eight inches out of place, and over and beyond the flange of the car wheel, as well as the testimony of other witnesses tending to show defects in the gearing of the brake beam, support the conclusion that this apparatus was in a defective and improper condition for use by the plaintiff in the manner he attempted to use it, and there was some testimony tending to render it probable that such condition existed before the car left Mart, and at the time the inspector said he inspected it; and, if such condition existed at that time, the failure to discover and remedy it would support a finding of negligence.

[5] 2. As the law now is, if the defendant was guilty of negligence in the particulars referred to, contributory negligence on the part of the plaintiff would not preclude a recovery. However, if he was guilty of contributory negligence, we might feel constrained to hold that the verdict is excessive. In fact, the size of the verdict indicates that no diminution was allowed on account of contributory negligence; but we have reached the conclusion that if the defendant was guilty of negligence in failing to exercise proper care in reference to the brake beam, the jury was warranted in finding that the plaintiff was not guilty of contributory negligence. There is nothing to indicate that he knew anything of the defective condition of the brake beam prior to or at the time of the accident; and therefore, if the defendant owed him the duty of exercising reasonable care to keep it in proper condition, he had the right, in the absence of knowledge of its condition, to use it in the manner attempted, and was not guilty of negligence in attempting so to do. Hence we hold that the finding that the defendant was guilty of negligence, coupled with the fact of the plaintiff's ignorance of the defective condition of the

brake beam, shows that the plaintiff was not guilty of contributory negligence.

3. The able counsel representing the respective parties have cited quite a number of authorities, two of which we deem it proper to review. The main case relied on by counsel for appellant is Railway Co. v. Anderson, 118 S. W. 1113, decided by the Texarkana Court of Civil Appeals. In that case, as in this, the plaintiff was a brakeman, and was injured while attempting to mount and ride upon a brake beam; but in that case no defect was charged as to the brake beam, but it was charged that the defendant was guilty of negligence in permitting a long piece of wire, with its ends tied together, to be and remain where it caught one of the plaintiff's feet and caused him to fall, so that a car wheel passed over his foot. In that case, as in this, the defense of contributory negligence was interposed, and at that time such negligence constituted an absolute defense. The Court of Civil Appeals held that the testimony failed to show that the defendant was guilty of negligence, and did show that the plaintiff himself was guilty of negligence. The existence of the wire upon the track, and the fact that it caused the plaintiff to fall and sustain injury, was all the testimony submitted for the purpose of showing negligence on the part of the defendant; and it was held that proof of such facts raised no presumption, and warranted no conclusion, of negligence. In that case, as in this, there was testimony tending to show that it was customary for employés to so use a brake beam, and, notwithstanding such proof, the Court of Civil Appeals held that the plaintiff was guilty of negligence as matter of law; and upon both grounds—that is, failure to prove negligence against the defendant, and the proof of negligence by the plaintiff—that court reversed the case and rendered judgment for the railroad, and the Supreme Court denied an application for writ of error. We do not regard the action of the Supreme Court in refusing to grant the writ of error as adopting or approving all that was decided by the Court of Civil Appeals. Railway Co. v. Romans, 103 Tex. 4, 121 S. W. 1104, and Railway Co. v. Jones, 103 Tex. 187, 125 S. W. 309, decided by the Supreme Court at the same term that the writ of error was refused in the Anderson Case, support the holding of the Court of Civil Appeals in the latter case, to the effect that the testimony failed to show that the defendant was guilty of any negligence; and, that ruling being correct, it was proper for the Supreme Court to deny the writ of error, without passing upon the correctness of the other holding of the Court of Civil Appeals. Hence we do not consider ourselves bound by the decision of the Court of Civil Appeals in holding that Anderson was guilty of negligence as matter of law.

In support of the converse of that proposition, counsel for appellee cite and rely upon many decisions, including Railway Co. v. Keith, supra, which was decided by the Texarkana Court of Civil Appeals, and after the decision rendered in the Anderson Case. In that case the injured brakeman did not take hold of the iron bar on the end of the car, and did not attempt to mount the beam with both feet. On that point the court's statement is: "Keith ran beside that car, as he said, leaped, and caught with his hand the handhold at or near the rear end of it as it was then moving, and at the same time put his foot and weight on the end of the brake beam, as he said; his purpose being to uncouple the car by operating the coupling lever, mount it, and stop it by means of the brake when it had gone far enough to clear the main track. When his weight was placed against the end of the brake beam it, as he said, at once gave way laterally and slipped by the car wheel, causing his foot to drop across the rail of the track, when the wheel of the next car ran over and crushed it, causing amputation to be necessary. No other witness but Keith saw the way that he was injured. The other witnesses testified to facts that make a conflict in the evidence as to whether Keith at the time of his injury was riding between the cars or on the side of the car. On this conflict we are bound by the jury's finding, and assume the truth thereof as testified to by Keith. It was proved that brakemen invariably and necessarily rode the ends of the brake beams in similar circumstances, and that Keith's conduct and manner of operating the cars on that occasion were customary among trainmen, and that Keith had no occasion to operate the car or ascertain the condition of its brake beam before the time of his injury." On that state of facts the Court of Civil Appeals in its opinion said: "It being established, and not questioned, that brakemen in the service of appellant, when switching, commonly and necessarily rode the cars by catching the handles and standing on the ends of the brake beams, and this with the knowledge and acquiescence of appellant, and that this particular car in question was to be switched to the siding at Alto, then it is not doubted, the legal duty existed on the part of the appellant to use ordinary care to ascertain whether the brake beam of the car in question was in reasonably safe condition to be used by Keith, and failing in this duty would be negligence." True, it is there stated that it was established, and not questioned, that when switching, brakemen commonly and necessarily rode the cars by catching the handles and standing on the ends of the brake beams. But it is manifest that it was not absolutely necessary for them to stand upon brake beams while cars are in motion for the purpose of any service. If it is not

a matter of common knowledge, the proof in this case shows that freight cars are furnished with stirrups or ladders on each side, to be used by brakemen in the discharge of their duties, and that by giving the proper signal they can cause the engineer to stop the movement of a car whenever they desire it. Keith could have pursued the latter course, and avoided all danger.

The Keith Case is also relied upon, and correctly so, by counsel for appellee in support of the contention that the evidence in the case at bar supports the finding that the defendant was guilty of negligence in reference to the brake beam. Upon that question the opinion is too long to be here quoted, but those who are interested will find it well worth reading.

In further support of our holding that in this case the question of contributory negligence was a question of fact to be decided by the jury, we cite Railway Company v. Rogers, 128 S. W. 714; Railway Co. v. Kennedy, 139 S. W. 1012; Railway Co. v. Foth, 101 Tex. 143, 100 S. W. 171, 105 S. W. 322; Railway v. Engelhorn, 24 Tex. Civ. App. 324, 62 S. W. 561; Railway v. Waller, 27 Tex. Civ. App. 44, 65 S. W. 212; Galloway v. Railway, 78 S. W. 33; Railway v. Alexander, 117 S. W. 932; Railway v. Mathis, 101 Tex. 342, 107 S. W. 530.

[6] 4. The only remaining question is the charge that the verdict is excessive. While the verdict is large, we do not feel authorized in holding that it is so large as to indicate that the jury was influenced by sympathy, prejudice, or other improper motive. At the time of the accident plaintiff was 30 years old, in good health, and earning an average of $82.50 per month; his right foot was crushed by the car wheel, and some hours later was amputated above the ankle; he suffered pain at the time his foot was run over and before its amputation, and the pain still continues. The cause of the continued pain is that at one place, at the end of the stub leg, it has been left sensitive, so that it aches like an exposed nerve in a tooth, and, after standing upon it, it becomes necessary to put the stump in cold water in order to alleviate the pain. It was shown that the plaintiff's earning capacity had been reduced from $1,000 to $60 per annum. The following, among many other cases, support the ruling that the verdict in this case should not be declared excessive: Railway Co. v. Toliver, 37 Tex. Civ. App. 437, 84 S. W. 377; Railway Co. v. Bernard, 57 S. W. 686; Railway Co. v. Cooper, 2 Tex. Civ. App. 42, 20 S. W. 990; Railway Co. v. McLeod, 131 S. W. 311; Railway Co. v. Hynes, 21 Tex. Civ. App. 34, 50 S. W. 624.

Upon the whole case, our conclusion is that the judgment should be affirmed, and it is so ordered.

Affirmed.